STATE

v.

**Andrew JEREMIAH et al.**

No. 96–20–C.A..

Supreme Court of Rhode Island.

June 25, 1997.

Jane McSoley, Andrea J. Mendes, Aaron Weisman, Providence, for Plaintiff.

Robert I. Deutsch, Chestnut Hill, MA, Robert Godfrey, Marty Marran, Cranston, Janice M. Weisfeld, Paula Rosin and Paula Lynch Hardiman, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

■ A search warrant that fails to "describ[e] as nearly as may be * * * the place to be searched" violates article 1, section 6, of the Rhode Island Constitution. Any evidence seized pursuant to such a warrant must be suppressed and may not be used to convict a person whose constitutional rights

have been violated by the use of this type of overbroad or general writ. *See, e.g., State v. Costakos,* 101 R.I. 692, 694–96, 226 A.2d 695, 696–97 (1967). Because the search warrant employed here did not describe the place to be searched "as nearly as may be," we conclude that it violated the constitutional right of the defendants, Andrew and Bruce Jeremiah (the Jeremiahs), to be free from unreasonable searches and seizures. Thus, the evidence garnered under its aegis should have been suppressed instead of being used to convict them. For this reason, we reverse the Superior Court's judgments convicting the brothers Jeremiah of various drug-trafficking offenses.

## Background

The Jeremiahs' convictions stemmed from their alleged involvement in a marijuana-distribution ring supposedly headquartered in the Silver Spring Center (Silver Center), a sprawling commercial park consisting of some eighteen multistory buildings [1] splayed across twelve acres of urbanscape, and all of it embraced within the misleadingly concise address designated on the warrant as 387–389 Charles Street, Providence, Rhode Island.

In early 1992 Patrick McNulty (McNulty), a state narcotics agent, began an investigation in Providence of a suspected marijuana-trafficking venture. A confidential informant (CI) had told him that Andrew Jeremiah, John Steacy (Steacy), and a Mexican national (later identified as Jose Antonio Solis Ayerdi (Ayerdi)) were harboring approximately 500 pounds of cannabis that had been packed into two crates and stashed inside a warehouse at 387 Charles Street.[2] Informed that Steacy and Ayerdi were living high on the hog at a posh downtown Providence hotel, McNulty decided to intensify his surveillance of their activities. At some point he saw the two drive off in a car bearing dealer plates registered to Jeremiah Motors. The men led McNulty to Silver Center. Another member of the surveillance squad watched the same car pull into a garage in "Building 5" of that complex.

McNulty and other law enforcement officials, including Providence Police Detective Nicholas Cardarelli (Cardarelli), met to strategize. Cardarelli prepared an affidavit (which relied almost exclusively on clues furnished by the CI), and the police submitted a complaint to the District Court that sought authorization to search and seize contraband found in a *"four story* red brick factory complex with a *loading dock* and a large garage overhead door" located at *"387* Charles Street." (Emphases added.) On the basis of these submissions, a District Court master later issued a search warrant commanding authorized officers to seize any marijuana and drug paraphernalia found at the "387–389 Charles Street Jeremiah Silver Ctr. Complex." [3] (Emphasis added.)

McNulty set out to execute the warrant but temporarily refrained from doing so. Rather, posing as a fire inspector and accompanying the fire marshall, McNulty was allowed by Bruce Jeremiah to tour both building No. 4 (a four-story structure located at 389 Charles Street that has an overhead door and a loading dock) and building No. 5 (a three-story structure also located at 389 Charles Street that has an overhead door but no loading dock). During their inspection, something caught McNulty's eye in building No. 5: two large crates stood next to the fire extinguisher, oil drums, and other warehouse bric-a-brac. Shortly after the tour ended McNulty flashed the warrant and pried open the crates. Inside, he discovered about 425 pounds of marijuana. Members of the search party then repaired to building No. 4, where they found several bags of marijuana near the Jeremiahs' offices.

In due course a grand jury indicted the brothers Jeremiah, together with Steacy and Ayerdi, on a myriad of marijuana-related

---

1. Because of the manner in which the buildings were connected, different conclusions could be drawn regarding exactly how many buildings were located within the Silver Center complex; eighteen is a conservative count.

2. The CI had been to the warehouse and had personally observed the crates.

3. Some of the Silver Center buildings are situated on 387 Charles Street, and some are on 389 Charles Street.

offenses. The Jeremiahs moved to suppress the evidence that had been seized during the search by challenging the particularity of the warrant used to obtain the incriminating evidence and by claiming that it violated the specificity requirement contained in both the State and the Federal Constitutions.[4]

Following a hearing, a Superior Court justice denied their motions. The Jeremiahs proceeded to trial, and a jury convicted them of possessing marijuana with the intent to distribute and conspiring to achieve those ends.[5] These appeals ensued.

### Analysis

▮▮▮ Although the Jeremiahs challenge their convictions on multiple grounds, their core complaint is that the trial justice stumbled over the application of bedrock constitutional search and seizure principles when he denied their suppression motions. Specifically, they insist that the warrant used to search their premises gave the police too free a hand to rummage at will through a vast commercial area because it did not describe the place or places to be searched with the requisite particularity. See R.I. Const. art.

4. Compare R.I. Const. art. 1, sec. 6 ("[t]he right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched") with U.S. Const. Amend. IV ("[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched").

5. Steacy was also found guilty of conspiring to possess marijuana with intent to distribute, but Ayerdi fled before trial, supposedly returning to his native Mexico.

6. Rhode Island's original "bill of rights" also declared that warrants must describe the place to be searched "as nearly as may be." See An Act declaratory of certain Rights of the People of this State, § 2, Public Laws of the State of Rhode Island and Providence Plantations 80 (Jan. 1798). However, this provision was statutory because the existing constitution—the Royal Charter of 1663—did not have a mechanism for passing amendments. See The Bill of Rights and the States: The Colonial and Revolutionary Origins of American Liberties 155 (Patrick T. Conley

1, sec. 6; see also U.S. Const. Amend. IV. In assaying the Superior Court's decision to deny the motions to suppress, we apply the clearly erroneous standard of review, mindful that we must examine the evidence in the light most hospitable to the state. State v. Roddy, 401 A.2d 23, 30 (R.I.1979). Having performed this task, we are left with the definite and firm conviction that the police crossed the constitutional line in obtaining the warrant and stepped out of legal bounds in executing it because it was much too general in its description of the area to be searched.

Article 1, section 6, of our constitution provides that "no warrant shall issue, but * * * upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched and the persons or things to be seized." (Emphasis added.)[6] Like its federal analogue, see U.S. Const. Amend. IV, this provision reflects Rhode Island's revulsion towards those general warrants known as writs of assistance that agents of the British Crown used to harass our colonial forebears.[7] Compare

& John P. Kaminski eds.1992) (hereinafter The Bill of Rights). But see generally Kevin D. Leitao, Rhode Island's Forgotten Bill of Rights, 1 Roger Wms. U.L.Rev. 31, 32, 46 (1996) (arguing that existing accounts of Rhode Island's constitutional convention of 1790, convened to consider ratification of the United States Constitution, substantiate that Rhode Island "has a forgotten bill of rights enacted by the people in the constitutional convention" that ratified the Federal Constitution and that one of its provisions states that "all general warrants (or such in which the place or person suspected are not particularly designated) are dangerous, and ought not to be granted"). During the 1830s the political activists who pushed for a popularly written constitution to replace the Royal Charter frequently argued that the legislative rights of 1789 were too porous a foundation upon which to ground our civil freedoms. The Bill of Rights, at 155. Article 1 of the Rhode Island Constitution of 1843—entitled the "Declaration of Certain Constitutional Rights and Principles"—plugged these holes. Id.

7. Interestingly, in 1663 a trio of Rhode Islanders, with axes raised, refused an officer entry into their home. Although he possessed a warrant and demanded access in the King's name, they shouted, "the king they owned and the Court they owned but they would not come out: but were Resoullfed to knocke Downe any man that

*generally* Telford Taylor, *Two Studies in Constitutional Interpretation* 19 (1969) (noting that "the fourth amendment was the product of particular events that closely preceded the Constitution and the Bill of Rights") *with* Kevin D. Leitao, *Rhode Island's Forgotten Bill of Rights*, 1 Roger Wms. U.L.Rev. 31, 47 (1996) (noting that Rhode Island's "Declaration of Rights included provisions that were parallel to most of the rights enumerated in the proposed amendments that constitute the U.S. Bill of Rights"). These writs, valid for the lifetime of the reigning sovereign, empowered the executing officers, in their discretion, to make a general search of suspected places for smuggled goods or merchandise.[8] The colonists thought the writs of assistance to be the "worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of the constitution, that ever was found in an English lawbook" because they put "the liberty of every man in the hands of every petty officer." 2 *Legal Papers of John Adams* 140, 142 (L. Kinvin Wroth & Hiller B. Zobel eds.1965) (quoting James Otis, Jr., who in 1761 argued against the British-imposed writs of assistance before the Massachusetts Superior Court after the death of King George II).[9]

should pry in upon them for ther howse was ther Castle and this was the mine of one and all." *See 2 Rhode Island Court Records: Records of the Court of Trials of the Colony of Providence Plantations 1662–1670* 15–16 (Providence Historical Society 1922).

8. One writ, for example, ordered all persons to allow "Charles Paxton Esqr. surveyor of all Rates, Duties, and Impositions" to

"enter and go on board any ship, Boat or other Vessel * * * then and there found to View and search and strait to examine in the same, touching the Customs and subsidies to us due, and also in the day Time together with a Constable or other public officer inhabiting near unto the Place to enter and go into any Vaults, Cellars, Warehouses, shops or other Places to search and see, whether any Goods, Wares or Merchandizes in the same ships, Boats or Vessells, Vaults, Cellars, Warehouses, shops or other Places are or shall be there hid or concealed * * * and to open any Trunks, Chests, Boxes, fardells or Packs made up or in Bulk, whatever in which any Goods, Wares, or Merchandizes are suspected to be packed or concealed." Writ issued from Commissioners of Customs to Charles Paxton (Jan. 8, 1752), *reprinted in 2 Legal Papers of John Adams* 133–34 (L. Kinvin Wroth & Hiller B. Zobel eds.1965). Another writ authorized its holder to seize "any prohibitted and uncustomed goods" and to impound all ships "suspected to have transgressed the Lawes of Trade and Navigation" and required all "civill and military" personnel— "Sheriffs[,] Justices of the Peace," ships' "Masters," and "to all other persons therein whom it may concern"—to lend a hand. Writt of Assistance ordered for Patrick Mein Esq. (Nov. 9, 1686), *reprinted in 5 Archives of Maryland* 523– 24 (William H. Browne, ed.; Baltimore, Maryland, Historical Society 1887). This customs agent's commission added that

"he hath Power to enter into any Ship, Bottom, Boat or other Vessell, as alsoe into any shop, House, Ware House, Hostery or other place whatsoever to make diligent search into any Trunk, Chest, Pack, Case, Truss or any other parcell or packadge whatsoever, for any goods, wares, merchandizes prohibited to be exported or imported, or whereof the Customes or other Dutyes have not been duely paid and the same to seize to his Majesty's use and alsoe to put in execution all other the lawfull powers and authorityes for the better manageing and collecting the said rates and dutyes in all things proceeding as the law directs Hereby praying and requireing * * * Officers and Ministers and all others whom it may concern to be aiding and assisting to him in all things as becometh." *Id.* at 521.

9. The following resolution, drafted by several prominent Bostonians, also protested that

"our houses and even our bed chambers, are exposed to be ransacked, our boxes chests & trunks broke open ravaged and plundered by wretches, whom no prudent man would venture to employ even as menial servants; whenever they are pleased to say they *suspect* there are in the house wares & c for which the dutys have not been paid. Flagrant instances of the wanton exercise of this power, have frequently happened in this and other sea port Towns. By this we are cut off from that domestick security which renders the lives of the most unhappy in some measure agreable." 2 *The Writings of Samuel Adams* 361–62 (Harry Alonzo Cushing ed.1906).

A colonist in Pennsylvania concurred with " 'the greatest asserters of the rights of Englishmen' " that writs of assistance were " 'dangerous to freedom, and expressly contrary to the common law, which ever regarded a man's house as his castle, or a place of perfect security.' " Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 70 n. 67 (Da Capo Press 1970) (1937) (quoting the ninth of John Dickinson's "Letters of a Farmer"). And a South Carolinian denounced the writs as " 'of a more pernicious nature than general warrants' " because "without any crime charged and without any suspicion, a petty offi-

The writs became one of the key rallying points that eventually led the colonies to declare their independence and to take up arms against their British oppressors.[10] *Compare 1 Journals of the Continental Congress 1774–1789* 116 (1904) (photo reprint 1968) (quoting a petition sent to the Crown by the Continental Congress in 1774, complaining that the "officers of the customs are empowered to break open and enter houses without the authority of any civil magistrate founded on legal information") *with* The Declaration of Independence para. 12 (U.S. 1776) (condemning the Crown for sending "hither Swarms of Officers to harass our People, and eat out their Substance").

■ Although the "as nearly as may be" requirement in our constitution is satisfied when the description is such that the executing officer can with reasonable effort identify and ascertain the place to be searched, *Costakos*, 101 R.I. at 694–95, 226 A.2d at 696, a search warrant comes a cropper constitutionally

"if the description is so indefinite that under the authority of the warrant an officer can exercise a selective discretion in determining where he will search or can invade the property of strangers to the process and disturb their peace and tranquility." *Id.* at 695, 226 A.2d at 697.

■ Here lies the rub with this search warrant. It neither recites "as nearly as may be" the premises to be probed nor differentiates the desired target area within those premises from all possible other places in this multiunit complex. When the police obtained the search warrant, Silver Center was a dispersed business park comprised of at least eighteen buildings and ten warehouses divided into eighty-three units, of which forty-four were rented to thirty different tenants across twelve acres of commercial property. Unlike the situation in *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987),[11] the police knew when they applied for this warrant that the Silver Center address could be divided descriptively into more discrete subsections than the designation used in the warrant to identify the place to be searched. Indeed, Cardarelli testified that he was only concerned with the four-story building (that is, building No. 4). His affidavit in support of the warrant application indicates that he was interested in the crates squirreled away in "a warehouse located at *387* Charles Street." (Emphasis added.) The complaint also described the place to be searched "as being a *four* story red brick factory complex with a *loading dock* and a large garage overhead door." (Emphases added.) But the crates of cannabis were found in the *three*-story structure (that is building No. 5) that has *no loading dock* and is situated on *389* Charles Street. Consequently Cardarelli's affidavit and the complaint cannot be relied upon to clarify or to narrow the actual places to be searched under the warrant because they are both misleading and themselves insufficiently specific. In any event, the warrant—which directed the officers to seize marijuana and drug paraphernalia found on premises described as "387–389 Charles Street Jeremiah Silver Ctr. Complex"—was fatally flawed because it authorized the police to conduct a blanket or general search of the entire twelve-acre, eighteen-building, ten-warehouse, eighty-three-separate-unit Silver Center compound.

---

cer has power to cause the doors and locks of any man to be broke open, to enter his most private cabinet, and thence to take and carry away whatever he shall in his pleasure deem uncustomed goods." *Id.* at 75 & n. 81 (quoting Judge William Henry Drayton's August 10, 1774 letter to the First Continental Congress).

10. Commenting on the impact of Otis's impassioned plea against the Crown's search-and-seizure policies, John Adams remarked: "Otis was a flame of fire! * * * Every man of a crowded audience appeared * * * ready to take arms against writs of assistance. * * * Then and there the child Independence was born. In fifteen years, namely in 1776, he grew up to man-

hood, and declared himself free." 10 *The Works of John Adams* 247–48 (Charles Francis Adams ed.; Boston, Little, Brown and Company 1856).

11. In *Garrison,* the description of the place to be searched in a warrant was more sweeping than appropriate "because it was based on the mistaken belief that there was only one apartment" on the floor of the building. Nonetheless, the warrant in *Garrison* was found to be valid because the police did not know, nor should they have known, that there were multiple dwelling units on that floor. *Maryland v. Garrison*, 480 U.S. 79, 85, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72, 81 (1987).

The state argues that the warrant was as particularized as it could be in the circumstances because the police had a difficult time pinpointing the exact location of the crates within the complex. In support of this contention, the state claims, inter alia, that no numbers were affixed to the outside of the buildings and that the city of Providence sends the tax bills for building No. 4 to 387 Charles Street. But the state does not say what the police knew about the discrete subparts of the complex before they applied for the search warrant, nor does it indicate to what extent the police disclosed what they knew about the complex to the District Court master when they applied for the warrant. *Cf. Garrison,* 480 U.S. at 85, 107 S.Ct. at 1017, 94 L.Ed.2d at 81 (noting that courts "must judge the constitutionality of [the police's] conduct in light of the information available to them at the time they acted," adding that "[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate"). Ultimately, given the vast scope of commercial territory embraced by the address cited in the warrant, we are not convinced that the police exhausted reasonably available means to "describ[e] as nearly as may be * * * the place to be searched." For example, the CI had been to the warehouse and had personally observed the crates there, but neither the warrant nor the application reflects exactly where (that is, in what part of what building) the crates were located when the CI last saw them. Moreover, the police waited until after they had obtained the warrant to accompany the fire inspector into building No. 5, where they then saw in plain view the very crates that were the object of their search.

### Conclusion

To catch drug dealers is laudable. But to catch them by unlawful means is lamentable. Here the police obtained and executed a search warrant that amounted to a modern-day version of the dreaded writ of assistance. In so doing, they violated the Jeremiahs' constitutional rights to be free from unreasonable searches and seizures. Accordingly we sustain their appeals, reverse their judg-

ments of conviction, suppress all evidence seized pursuant to the defective warrant, and remand this case to the Superior Court for further proceedings consistent with this opinion.

GOLDBERG, J., did not participate.