May 29, 2025

**Supreme Court**

No. 2023-235-C.A.
(P1/19-6260AG)

| | | |
|---|---|---|
| State | : | |
| v. | : | |
| Chandanoeuth Hay. | : | |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Chandanoeuth Hay. | : |

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**   The defendant, Chandanoeuth Hay, appeals from a June 9, 2023 judgment of conviction and commitment following a jury trial held in the Providence County Superior Court.  The defendant was charged with ten counts stemming from a shooting that took place on June 26, 2018 in Providence, Rhode Island.  The jury found him guilty of all ten counts.

On appeal, defendant presents four grounds for reversal of his conviction.  He asserts that the trial justice erred in (1) allowing a police sergeant to offer a lay opinion; (2) denying a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978); (3) allowing a witness to testify about "unrelated shootings;" and (4) admitting certain photographs of defendant.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

The criminal prosecution giving rise to this appeal arose from a series of events that led to the fatal shooting that took place in the immediate vicinity of 100 Lowell Avenue in Providence in the early morning hours of June 26, 2018. That shooting resulted in the tragic death of David Page.

The genesis of this case began with an unrelated police investigation into the activities of one Kennedy Terrero, which eventuated in his arrest. After his arrest, Mr. Terrero cooperated with the police in the investigation of the murder of Mr. Page. That investigation eventually resulted in the police concluding that defendant and his codefendant, Jaythan Hang, were involved in that murder.[1]

On December 9, 2019, a grand jury indicted defendant on ten counts: one count of first-degree murder; one count of conspiracy; two counts of assault with a dangerous weapon; three counts of discharging a firearm while committing a crime of violence; one count of discharging a firearm from a motor vehicle, thereby

---

[1] We preliminarily note that defendant had moved pursuant to Rule 14 of the Superior Court Rules of Criminal Procedure to sever his trial from that of the codefendant, Jaythan Hang. The trial justice denied said motion; as a result, the codefendants were tried in the same trial. It should be emphasized, however, that this opinion deals only with the appeal of defendant Chandanoeuth Hay. Nevertheless, for the sake of clarity, it will be necessary for us from time to time to make reference to codefendant, Jaythan Hang. For the same reason, we shall from time to time refer to Mr. Hay and Mr. Hang as the codefendants.

creating a substantial risk of death or serious personal injury; one count of carrying a firearm without a license; and one count of possession of a firearm after a conviction of a crime of violence.

On August 30, 2022, defendant filed several pretrial motions.[2] Hearings on those motions were held on August 31, 2022 and on several dates in September of that year. Before us on appeal are the following pretrial motions which the trial justice denied: defendant's motion to suppress certain tangible evidence; defendant's motion *in limine* to exclude certain testimony from Sergeant Jonathan Primiano; defendant's motion *in limine* to exclude testimony from "the cooperating witness, Kennedy Terrero, or any other witness regarding alleged prior conduct of this Defendant and his codefendant involving the use of firearms;" and defendant's motion *in limine* to exclude photographic evidence and/or testimony regarding alleged gang involvement and/or defendant's membership in a gang. We shall discuss each of those motions in Part I.A, *infra*.

On September 12, 2022, jury selection began. Thereafter, a trial took place over the course of several weeks in September and October of 2022. On October 4, 2022, the jury began deliberations, at the conclusion of which it returned a guilty verdict on all counts. The defendant subsequently filed a motion for a new trial; and,

---

[2] Although defendant filed several pretrial motions, we discuss in this opinion only those whose denial has been challenged on appeal.

on November 1, 2022, there was a hearing on that motion as well as on a motion for judgment of acquittal (on which the trial justice had reserved). In due course, the trial justice denied both motions.

On February 13, 2023, defendant was sentenced as follows: two life sentences, to be served consecutively to each other; three concurrent six-year sentences, suspended with probation; one concurrent ten-year sentence, to be served; one concurrent ten-year sentence, suspended with probation; one concurrent five-year sentence, to be served; two consecutive ten-year sentences, suspended with probation; and a ten-year consecutive sentence as an habitual offender. The defendant filed a timely, albeit premature, notice of appeal on February 13, 2023.

We relate below the salient aspects of both the pretrial hearings and the trial itself.

**A**

**The Pretrial Motions**

In his "First Motion *in Limine*," defendant contended that the state should have been barred from "introducing photographic evidence and/or testimony in its case in chief regarding gang involvement and/or [defendant's] membership in a gang * * *." (Internal quotation marks omitted.) The defendant asserted that such evidence had no relevance under Rules 401 and 402 of the Rhode Island Rules of Evidence. The defendant further argued that the evidence should also have been

excluded pursuant to Rule 403 of the Rhode Island Rules of Evidence because any probative value that the evidence might have was substantially outweighed by the danger of unfair prejudice. After having heard the parties' arguments, the trial justice denied defendant's motion, finding that the photographs could be admitted into evidence to "demonstrate the close relationship between Mr. Terrero and [defendant]." However, the trial justice specifically barred Mr. Terrero from testifying as to "the meaning of any gang signs * * * as depicted in that photograph or any other photographs." She further added that she was "inclined to offer" a limiting instruction "as it relates to gang affiliations and group affiliations."

In defendant's "Fourth Motion *in Limine*," he moved to preclude Mr. Terrero from providing testimony regarding the "alleged prior conduct of * * * Defendant * * * involving the use of firearms" in previous shootings. It was defendant's contention that such evidence was inadmissible under Rule 404(b) of the Rhode Island Rules of Evidence and that it was also inadmissible under Rule 403. In ruling on the motion, the trial justice indicated that testimony concerning the "alleged prior conduct" would be admissible under Rule 404(b), although she added that it would be subject to a limiting instruction. She stated that the evidence would tend to be probative of "the motive, the opportunity, the intent of the defendant's preparation, having access to firearms, absence of mistake or accident involving firearms continually being used." The trial justice did exclude certain evidence relating to an

arrest of a different individual, stating that said evidence would constitute "more guilt by association than true 404(b) evidence * * *."

The defendant's "Fifth Motion *in Limine*" sought to preclude Sgt. Primiano from testifying that a vehicle depicted in certain surveillance video footage was consistent with an Audi. It was defendant's argument that, in view of the provisions of Rule 701 of the Rhode Island Rules of Evidence, Sgt. Primiano's testimony would constitute impermissible lay opinion. Moreover, defendant contended that, if the state were to introduce that testimony as expert testimony, a *Daubert*[3] hearing would be required. Prior to rendering her decision on the motion, the trial justice ruled that, before he testified before the jury, there would be a *voir dire* examination of Sgt. Primiano.

In the just-referenced *voir dire* hearing, Sgt. Primiano testified that he was a member of the Digital Forensic Unit of the Providence Police Department. He stated that, within that unit, his particular area of concentration was "[c]omputer and video forensics." Sergeant Primiano testified as to his extensive training in seizing, documenting, and analyzing video evidence. However, he acknowledged that he did not consider himself to be an expert in the identification of the make and model of vehicles.

---

[3] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Turning to the instant case, Sgt. Primiano testified that he became involved in the investigation of the murder of Mr. Page in June of 2018. He stated that he had seized video footage from "Plainfield Meat Market and Wishy Washy Laundromat." He added that Detective Michael Otrando was with him when he initially viewed the footage. Sergeant Primiano further testified that, when viewing the video, he noticed that there was a "suspect vehicle" involved. He further stated that Det. Otrando showed him "the two vehicles that he was specifically interested in, the first being a Cadillac, and the second being a dark vehicle that he believed to be an Audi at the time." It was Sgt. Primiano's testimony that, while he had not performed a formal analysis, he had agreed with Det. Otrando that, based on his own experience, the second vehicle looked like an Audi.

Sergeant Primiano testified that he conducted another review of the footage after the prosecution contacted him about performing a "re-analysis" of the video footage. He further testified to the "smaller details" that he generally examines when conducting a frame-by-frame analysis, such as the "shape of taillights, shape of windows, location of the license plate, * * * rims on the vehicle" as well as "any other identifiers that would assist [him] in confirming [his] suspicion * * * that it was an Audi." He added that he compared images from the video surveillance to images that he had obtained from the Internet "as well as images [which he] had obtained of the vehicle which was seized during this investigation." Sergeant

Primiano testified that, based on all these factors, it was his opinion that the "suspect vehicle in th[e] video footage" was "consistent with an Audi A6."

On cross-examination, Sgt. Primiano stated that he had used "Video Focus Pro software"[4] to further examine the footage. He testified that this software gave him the ability to view the video at a rate of thirty frames per second. Sergeant Primiano also acknowledged that, when conducting the Internet search of vehicles, he only sought pictures of 2006 Audis. He further acknowledged that he did not make "any comparisons of any other type of vehicle." Sergeant Primiano additionally indicated that he had not enhanced or clarified the video.

The trial justice ultimately denied defendant's "Fifth Motion *in Limine*." In doing so, she relied on this Court's opinion in *State v. Doyle*, 235 A.3d 482 (R.I. 2020).[5] In noting the similarity between the two cases, the trial justice stated: "Here, and just like in the [*Doyle*] case, the testimony or the conclusion, the opinion, the lay

---

[4]     With respect to the "Video Focus Pro software," Sgt. Primiano testified as follows: "Video Focus Pro is a proprietary software, a forensic tool used by video forensic analysts to analyze video evidence. I received a one-week training by Resolution Video in the use of that software and ongoing trainings through webinars with that software."

[5]     In *State v. Doyle*, 235 A.3d 482 (R.I. 2020), this Court held in pertinent part that a state police detective who had an established background in accounting and experience as a fraud examiner was properly permitted to provide lay opinion testimony regarding certain expenditures that were reflected on a credit card statement. *Doyle*, 235 A.3d at 498, 500-01.

opinion of the police witness is based upon their perceptions." She also noted that Sgt. Primiano would be subject to cross-examination.

In addition to the just-summarized motions *in limine*, defendant also filed a "Motion to Suppress Tangible Evidence," which sought suppression of "all evidence seized pursuant to the July 12, 2018 Search Warrant" and simultaneously moved for an evidentiary hearing pursuant to *Franks v. Delaware*. In that motion, defendant cited to *Franks v. Delaware*, 438 U.S. 154 (1978), and he argued that the affidavit in support of the search warrant contained "materially false statements, made knowingly and intentionally, or with reckless disregard for the truth." Specifically, at the pretrial hearing on the motion, defense counsel directed the court's attention to page one of the affidavit in support of the search warrant, wherein Detective Theodore Michael stated: "As Detectives Otrando and Sullivan began the investigation into this homicide, video surveillance at the time of the incident showed that the suspect vehicle was that of a Black Audi with heavy tint around all the windows." Defense counsel also noted the following additional statement in the affidavit: "As Detectives Otrando and Sullivan further investigated this vehicle, the vehicle was observed to be the same vehicle seen in the video footage related to the homicide." Defense counsel contended that it was not possible to identify the vehicle as being a black Audi.

The trial justice denied both the motion for a *Franks* hearing and the motion to suppress that incorporated defendant's *Franks* argument. The trial justice found that, while there could have been an "overstatement" by Det. Otrando, defendant had failed to prove that the affiant, Det. Michael, had any intent to deceive the court or that he "proceeded with reckless disregard for the veracity of the statements made when he conveyed Detective Otrando's belief * * *." The trial justice also found that, even if the just-referenced information had not been included in the affidavit, its absence would not "alter in any way the probable cause analysis as [to] the involvement of the black Audi, which comes directly from the so-called cooperating witness, whom we now know to be Leslie Pereira."

**B**

**The Trial**

There follows the pertinent testimony of those trial witnesses whose testimony we deem relevant to our resolution of the issues on appeal.

**1. The Testimony of Eddie Lee**

The state called Eddie Lee as one of its first witnesses. Mr. Lee testified that, in June of 2018, he would on occasion stay at the residence of his sister, Tiqua Pona,[6] which was located at 100 Lowell Avenue in Providence. Mr. Lee testified that,

---

[6] For the sake of clarity, we shall at times refer to the members of the Pona family by their first names. No disrespect is intended.

during the "late-evening hours of June 25th of 2018 going into the early-morning hours of June 26th, 2018," he was at the 100 Lowell Avenue residence with his mother, Carol Pona, and his sisters, Tiqua and Tonia Pona; he added that, as a result of a fight, Tiqua "kick[ed] [him] out" of her residence.

Mr. Lee further testified that his mother decided to leave with him and that she called her friend, David Page, who arrived at 100 Lowell Avenue not long thereafter. Mr. Lee stated that Mr. Page arrived at the residence in his Cadillac, which he was driving and "blasting some loud music * * *." It was his recollection that he got in the back seat of Mr. Page's Cadillac when it arrived and that the music was continuing to play. He added that his mother was in the passenger seat. It was further Mr. Lee's testimony that, after getting into the car, he heard shots "coming [his] way" and that he ducked down. He stated that "it seemed like a car drove by shooting" and that he assumed that the vehicle from which the shots came was "[d]ark-colored." Mr. Lee testified that, after the shooting had ceased, he checked to see if his mother had been hit and that it was then that he observed that Mr. Page's head was resting on the steering wheel.

### 2. The Testimony of Lieutenant Matthew Jennette

Lieutenant Matthew Jennette of the Providence Police Department stated that, in the early morning hours of June 26, 2018, he received a call indicating that shots had been fired at 100 Lowell Avenue and that, upon receiving the call, he responded

- 11 -

to the scene. He testified that, upon arriving at 100 Lowell Avenue, he noticed a "Cadillac with a person shot inside the driver's seat," which person he noted was unresponsive. He further recalled "rescue transporting him from the scene."

### 3. The Testimony of Doctor Patricia Ogera

Patricia Ogera, M.D., testified as to an autopsy report that she had drafted regarding an autopsy which she had performed on Mr. Page. She testified that the autopsy report indicated that the place of Mr. Page's death was Rhode Island Hospital and that the date and time of his death was 3:25 in the morning on June 26, 2018. Referring to the autopsy report, Dr. Ogera testified that the injuries which she had noted were a "gunshot wound to the head, and two scrapes on the back of the scalp and on the right knee." According to Dr. Ogera, the cause of Mr. Page's death was a gunshot wound to the head. She testified that the manner of death was homicide.

### 4. The Testimony of Sergeant Alex Kanelopoulos

Sergeant Alex Kanelopoulos of the Providence Police Department testified that in 2018 he was an investigator in the Narcotics Unit and that in that year Mr. Terrero became a target in a narcotics investigation. Sergeant Kanelopoulos testified that, in the course of that investigation, he focused on two Providence addresses: (1) 59 Mink Road, second floor, Apartment 2; and (2) 156 Hanover Street, third floor.

Sergeant Kanelopoulos stated that the police obtained search warrants for both addresses.

Sergeant Kanelopoulos testified that, in executing the search warrant for the 156 Hanover Street address, the police encountered Mr. Terrero and subsequently detained him. Sergeant Kanelopoulos testified that the police seized a key belonging to an Audi during the search. He also stated: "It was developed throughout our investigation during the execution of both search warrants that there was a stolen vehicle that was * * * at a parking lot * * * near the intersection of Stamford and Bissell." He further testified that the key seized from the 156 Hanover Street search belonged to a "black, stolen Audi." Sergeant Kanelopoulos testified that, upon arriving at the intersection of Stamford and Bissell, he observed a black Audi with a Virginia registration in a parking lot. He further stated that he used the seized Audi key to unlock the vehicle in order to "confirm that the vehicle key belonged to this actual vehicle."

Sergeant Kanelopoulos testified that the police also executed a search warrant for the 59 Mink Road address, where the police found cocaine residue in the bedroom of Mr. Terrero and his girlfriend, Leslie Pereira. He added that, in addition, they found ammunition and drugs in the bedroom of Ms. Pereira's son as well as shotgun ammunition in the kitchen. Sergeant Kanelopoulos testified that Ms. Pereira's son arrived during the course of the police search and was taken into

custody. According to Sgt. Kanelopoulos, it was Ms. Pereira who told the police that the stolen Audi had been dropped off in a parking lot at the intersection of Stamford and Bissell.

### 5. The Testimony of Detective Michael Otrando

Detective Michael Otrando of the Providence Police Department testified that he was assigned to the investigation of the murder of Mr. Page. He testified that one of the first things he did in the course of the investigation was to review the surveillance footage from Plainfield Market and Wishy Washy Laundromat. He added that he had retrieved the surveillance videos accompanied by Sgt. Primiano. Detective Otrando stated that their review of the surveillance footage included "zoom[ing] in and actually go[ing] frame by frame and tak[ing] some still shots of the video as well." Detective Otrando stated that, in reviewing the footage, they had observed "the victim's vehicle enter Lowell Avenue, and approximately ten seconds later [they] observed a black vehicle, chrome rims with tinted windows, following behind."

It was Det. Otrando's testimony that, based on his review of the footage and his comparison of the vehicle in the footage with photographs of vehicles which he found on the Internet, it was his belief that the vehicle in the videos was an Audi. He added that he then performed a search in the Providence Police database for stolen cars matching the description of the Audi, and he stated that the search

produced information about a 2005 black Audi that had been stolen on June 21, 2018. Detective Otrando testified that, when reviewing the stolen-auto report relative to that vehicle, he noticed that there was a "narcotics narrative," which led him to several names that were involved in that investigation, including that of Ms. Pereira. It was his testimony that Ms. Pereira eventually brought him to the location of the stolen Audi.

### 6. The Testimony of Sergeant Jonathan Primiano

Sergeant Jonathan Primiano of the Providence Police Department also provided testimony. He stated that he had participated in the investigation of the murder of Mr. Page, and he testified as to his experience and his certifications in "digital forensics"—which resulted in his being involved in seizing and analyzing video surveillance. He also stated that he was involved in the reviewing and extraction of the video surveillance footage relative to this case.

Sergeant Primiano provided testimony concerning the contents of the videos. However, before the trial justice permitted Sgt. Primiano to express his opinion as to "the make of the black vehicle that appears in those videos," she cautioned the jury as follows:

> "Sergeant Primiano's opinions that will be expressed in just a moment is not expert in nature, but is offered for your consideration, and is based upon his personal observations as a police officer. It is up to you to assess the credibility of his testimony and determine how much

weight you will give to it, in the same manner that you consider the testimony of every other witness."

After the trial justice gave that cautionary instruction, Sgt. Primiano testified that, at the time of his initial review of the video surveillance footage, he believed "the vehicle to be consistent with that of an Audi." Sergeant Primiano's remaining testimony as it relates to the video surveillance footage was substantially the same as the testimony which he had provided during the *voir dire* hearing on the pretrial motions.[7]

### 7. The Testimony of Kennedy Terrero

The state also called Kennedy Terrero, a cooperating witness, to testify. Mr. Terrero testified that, in the Spring of 2016, he became a "full-fledged member of the Hanover Boyz," a local gang. He testified about another gang called the "Providence Street Boys." He explained that the Providence Street Boys gang was separate and apart from the Hanover Boyz gang. Mr. Terrero further stated that the number "864" referred to an alliance between the Providence Street Boys and the Hanover Boyz.

Mr. Terrero also testified regarding his tattoos. He testified that a tattoo on his right hand reads "864" and is accompanied by a Spartan helmet. He also testified about a tattoo on his forehead, which reads "Malle;" and he said that that tattoo refers

---

[7] *See* Part I.A, *supra*.

to a friend of his who had been murdered.[8]  Mr. Terrero additionally described a tattoo on his left hand, which reads "OTF;" and he said that "OTF" stands for "[o]nly to family," with "family" meaning one's gang.

Mr. Terrero testified that he had become familiar with an individual whose "street name" is Big Kay, and he identified defendant as being that individual.  He indicated that defendant was a part of what he referred to as "that 864 crossover back in the summer of 2018."  Mr. Terrero further testified that he had also become familiar with the codefendant, who went by the street name "Ah Jay."  At this point in the testimony, the trial justice instructed the jury that "mere membership or affiliation with a  gang or group or friendship or association with their members is not evidence that the defendant * * * is of bad character or that he is necessarily disposed to commit a crime."  She added that any such evidence "is admitted for the limited purpose as it may * * * relate to the defendant's motive, plan, intent, or knowledge with respect to the charges for which he is presently on trial."

In the course of Mr. Terrero's testimony, the state sought to introduce Exhibits 95 to 99, which consisted of a series of photographs depicting Mr. Terrero together with defendant.  Defense counsel objected for the same reasons as were articulated at the hearing on the pretrial motions.  The trial justice overruled the objection, and

---

[8]     As will become clear hereinafter, "Malle" is the name used by some witnesses in this case to refer to the late Jamal Contreras.

the exhibits were admitted into evidence. With respect to Exhibit 98, Mr. Terrero testified that the photograph shows defendant bearing a Spartan helmet tattoo—virtually identical to the tattoo that Mr. Terrero testified is on his own right hand.

The state also elicited testimony from Mr. Terrero concerning certain events that led up to the shooting that took place in the immediate vicinity of 100 Lowell Avenue on June 26, 2018. First, Mr. Terrero testified that, in May of 2017, he (along with the codefendants and some "females") was involved in an incident on Gallup Street in Providence. Mr. Terrero testified that, at that time, he noticed a vehicle following the vehicle which he was driving and that defendant then instructed Ah Jay (i.e., codefendant Hang) to fire "a couple of shots at the car."

The state also questioned Mr. Terrero about a different incident in May of 2017, which took place "around the Cranston Street Armory." Regarding that incident, Mr. Terrero testified that he was driving a stolen vehicle with defendant as a passenger. He stated that, while he was driving around with defendant, defendant noticed an "op"—a term that other testimony reveals means an enemy of one's gang. Mr. Terrero testified that he then pulled closer to the vehicle containing the "op" and that defendant began shooting at that vehicle through the sunroof of the vehicle in which both he and defendant were riding.

Mr. Terrero also testified as to an event that took place on January 23, 2018. He testified that, on that date, his friend, Jamal "Malle" Contreras, was murdered.

He stated that, after that incident, the death of Mr. Contreras was frequently discussed; he added that both defendant and codefendant Hang often took part in those discussions. Mr. Terrero stated that the murder of Mr. Contreras brought about what he described as a "tense situation." He also testified that, on those occasions when he would speak with the codefendants about the Contreras murder, they would discuss "retaliation."

Mr. Terrero also testified as to an incident that occurred in late May of 2018 "at or around the intersection of Academy Avenue and Chalkstone Avenue." He stated that he was at a grocery store "at or around Academy and Chalkstone" when defendant arrived in a separate vehicle and told Mr. Terrero that he had been shot at. Mr. Terrero testified that the codefendant and the girlfriends of both men were also present in the vehicle with defendant. He further testified that he observed that the codefendant's girlfriend was bleeding.

Mr. Terrero additionally testified as to an incident that occurred during the morning of June 4, 2018. He stated that he was awakened by the sound of gunshots. Mr. Terrero testified that he reacted to that sound by grabbing his firearm and going outside. He stated that, upon going outside, he noticed "bullets on the ground."

As she had done in the pretrial hearings on defendant's pretrial motions, defense counsel objected to the introduction of Mr. Terrero's testimony about the several above-referenced events. The trial justice again overruled defense counsel's

objections. However, at the request of defense counsel, the trial justice provided a Rule 404(b) cautionary instruction after the discussion of each incident, with the exception of the testimony pertaining to Mr. Contreras's murder. While the exact phrasing of the cautionary instructions slightly varied, the instructions were substantially the same. For example, when instructing the jury after the discussion of the incident that took place around the intersection of Academy Avenue and Chalkstone Avenue, the trial justice stated:

> "I'm just going to once again instruct you jurors that, to the extent that you've heard additional testimony that on another occasion both [codefendants] were allegedly involved in another situation involving guns or being shot, bear in mind that, once again, neither of those individuals have been charged with any offense arising out of that situation. And from this evidence, you cannot conclude that either defendant is a bad person, or that either has the tendency or proclivity to commit the crimes with which they are both charged here before this court.
> "Any such evidence that you just heard, to the extent that you decide to consider it, may be admitted only for the limited purpose as it may, in your minds, relate to either defendant's state of mind, motive, knowledge, or intent, or to show some common scheme, plan, preparation, or opportunity on either defendant's part with respect to the conduct described by Mr. Terrero and the specific charges for which they each are presently on trial."

In addition to his testimony relating to prior shootings, Mr. Terrero also testified that, in or around June of 2018, he stole a black Audi. He stated that the gang would often use stolen vehicles for "sliding." (Mr. Terrero indicated that the term "sliding" refers to driving around in a vehicle and "[l]ooking for enemies.")

Mr. Terrero added that the black Audi was stolen for "sliding" purposes. He additionally testified as to a white Acura that he had also stolen and that was also intended to be used for "sliding."

Turning to the evening of June 25, 2018, Mr. Terrero testified that Ms. Pereira was driving the stolen white Acura while he was in the front passenger seat. Mr. Terrero stated that, for most of that day, they were "[r]iding around, smoking, drinking, [and] selling drugs." He stated that at some point he fell asleep and that, when he later awoke, he noticed that both codefendants were in the back seat. Mr. Terrero testified that he recalled smoking marijuana at that time, and he also recalled that defendant had asked him "to take a ride." He indicated that he understood the phrase "take a ride" to be synonymous with "slid[ing]" or going to "look for enemies." Mr. Terrero testified that he declined "to take a ride" and that this response angered defendant. Mr. Terrero stated that defendant told him that he needed his "grip back." It was Mr. Terrero's testimony that he believed the word "grip" to be a reference to the "Smith & Wesson .22 caliber" firearm that had been previously admitted into evidence. He further explained that that weapon was a gang "community gun," which he said meant a firearm "that anybody could use." Mr. Terrero stated that, after he met with the codefendants, all four persons then drove to the 59 Mink Road residence to retrieve the "grip," with the codefendants following in the black Audi.

According to Mr. Terrero, once they arrived at the Mink Road address, he entered "the residence through the back door, went downstairs, [and] grabbed the gun." He stated that, after he retrieved the firearm, he went back outside and gave it to the codefendants, who were waiting in the black Audi. Mr. Terrero testified that, after the codefendants left, he instructed Ms. Pereira to "switch cars" so that she would then be driving her rental Honda Accord.

It was further Mr. Terrero's testimony that, after he and Ms. Pereira got into the Honda Accord, they drove to the area of the 156 Hanover Street residence so that he could take a shower. He further stated that, in the early morning hours of June 26, 2018, he began engaging in a series of text messages with defendant. Mr. Terrero testified that he received the following text messages from defendant: "Be smooth Leavin Hanover." When Mr. Terrero responded "Boys ?" "Or [ops]," which words he said were meant to refer to the police or to enemies respectively; he said that defendant replied "Ops." Mr. Terrero also testified as to a text message that he had sent to defendant wherein he asked defendant if he needed "food," which he said was his way of referring to bullets. He added that defendant also had asked Mr. Terrero to bring him a hat. Mr. Terrero stated that defendant texted him: "It's some op shit"—which phrase he testified meant: "Something that has to do with enemies is going on."

Mr. Terrero testified that, after he had finished showering at Hanover Street and after collecting the items that defendant had requested him to bring, he went back to the location where Ms. Pereira had parked. He recalled seeing the codefendants in the Honda Accord with Ms. Pereira, and he testified that he got into the Honda Accord with them and that the four of them drove off. He added that, although he was in the front seat and the codefendants were in the back seat, he had no difficultly hearing the codefendants' conversation. Mr. Terrero testified that at one point he heard defendant say: "Ah Jay had no aim." It was Mr. Terrero's recollection that the codefendant did not say anything in response to that comment.

Directing his testimony once again to the black Audi, Mr. Terrero testified that, after what had occurred on June 25 and 26 of 2018, he along with Ms. Pereira and the codefendants eventually went to the parking lot where the black Audi was located and "started cleaning the inside" of the vehicle as well as changing its license plate. He explained that the "cleaning" entailed taking "some [Clorox] wipes and wip[ing] the interior down."

Mr. Terrero additionally testified that, on July 2, 2018, he was arrested at the 156 Hanover Street residence on several charges, including possession of cocaine with the intent to deliver. Mr. Terrero acknowledged that, in the course of the statement that he provided to the Providence Police on July 2, he admitted to having stolen the black Audi. Mr. Terrero also acknowledged that he had entered into a

cooperation agreement with the state regarding the testimony which he provided during trial.

### 8. The Testimony of Leslie Pereira

The state next called Leslie Pereira to testify. Ms. Pereira testified that, in June of 2018, she was living at 59 Mink Road. She stated that, at that time, she was in a relationship with Mr. Terrero. Ms. Pereira testified that she was with Mr. Terrero during the afternoon and evening hours of June 25, 2018. She stated that, at some point during that evening, she and Mr. Terrero went to the "area in and around th[e] McDonald's on Broad Street." Ms. Pereira testified that, while they were parked in a white Acura, Mr. Terrero fell asleep. She added that defendant arrived at the same parking lot and that he got into the white Acura with Ms. Pereira and Mr. Terrero. Ms. Pereira stated that she and Mr. Terrero left the parking lot so that Mr. Terrero could go "take a shower and lay down."

Ms. Pereira testified that, when they arrived at 59 Mink Road, Mr. Terrero got out of the vehicle and entered the back door of the residence. She recalled Mr. Terrero speaking with defendant in the rear of the 59 Mink Road building. Ms. Pereira testified that Mr. Terrero eventually reentered the white Acura and drove her to her car, which was parked near Cranston Street. She stated that, after getting into her vehicle, she parked near the 156 Hanover Street residence. She later stated that she did not see Mr. Terrero enter the 156 Hanover Street residence, but she assumed

- 24 -

that he had done so. Ms. Pereira testified that, while waiting in her parked car, she received a phone call from defendant.

It was Ms. Pereira's testimony that, after receiving the phone call, she met defendant at a parking lot. She stated that, when she arrived at the parking lot, defendant exited from what she believed was a black Audi and entered her vehicle. Ms. Pereira testified that defendant had asked her for Clorox wipes; however, she further explained that, because she did not have any wipes to offer, she gave him a t-shirt. She added that the codefendant was also in the car with defendant. Ms. Pereira testified that she observed the two men use the t-shirt to wipe down the black Audi. She stated that they then drove back to the area near the 156 Hanover Street residence.

Ms. Pereira testified that, when she returned to the 156 Hanover Street area with the codefendants, Mr. Terrero got into the vehicle. She stated that Mr. Terrero got in the front passenger seat, while the codefendants were seated in the back.

### 9. The Subsequent Travel of the Case

At the close of the prosecution's case, defense counsel moved for a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure, contending that the evidence "was inferential in all aspects" and that "there was no direct evidence of [defendant's] culpability." The trial justice stated that she was going to reserve ruling on the motion until the conclusion of all the evidence. After

defendant indicated that he would not testify and the defense rested, defense counsel renewed the motion for a judgment of acquittal; but the trial justice stated that she was "still going to reserve."

Before closing arguments began, the trial justice instructed the jury. In the course of her instructions, the trial justice emphasized the following:

> "Now, you have heard evidence in this trial that on other occasions these Defendants allegedly were involved in other misconduct. Bear in mind that neither Defendant has been charged with any offense arising out of that misconduct. That evidence was admitted for a limited purpose. It cannot be considered as proof of bad character on their part or proof that they acted in conformity with the uncharged alleged acts when you consider the charges in this case. However, if you do wish to do so, you may consider evidence of uncharged alleged acts for the limited purpose of proving the Defendant's intent, knowledge, motive, plan, or their participation in a felonious scheme such as a conspiracy and not for any other purpose."

After the parties presented their closing arguments, the jury began deliberations on October 4, 2022. On October 6, the jury found defendant guilty on all counts. Thereafter, defendant filed a motion for a new trial on the grounds that the evidence was legally insufficient to support a verdict of guilty beyond a reasonable doubt and that the weight of the evidence was not adequate to sustain a conviction. Additionally, defendant argued that "it was an error of law to admit [Rule 404(b)] evidence (of both prior bad acts and gang affiliation) that so drastically outweighed the direct evidence in this case * * *."

At a hearing on November 1, 2022, the trial justice addressed defendant's motion for a judgment of acquittal as well as his motion for a new trial. After articulating her reasoning in detail, the trial justice ultimately denied defendant's motion for a judgment of acquittal. The trial justice next turned to defendant's motion for a new trial. In addressing defendant's argument as it pertained to the Rule 404(b) evidence that was admitted at trial, the trial justice noted that, even if such "evidence clears the 404(b) hurdle, it may still be excluded if it does not survive scrutiny under 403 * * *." She repeated, in part, her initial conclusion relative to that evidence:

> "Importantly, this [c]ourt concluded that the incident on Gallup Street, near the Cranston Street Armory, at Academy Market, and even outside Kennedy Terrero's own apartment on Hanover Street earlier in June of 2018 would allow the jury to hear a complete and coherent story that the gang affiliation of Kennedy Terrero * * * [and codefendants] was necessary for such a complete and coherent story, and that the evidence of shootings in and around cars demonstrated a common scheme or plan as well as access that Kennedy Terrero * * * [and codefendants] all had to firearms."

The trial justice further noted the fact that some evidence had been excluded because she had found "such evidence to be unduly prejudicial and [had] excluded such evidence under a Rule 403 analysis." The trial justice concluded by denying defendant's motion for a new trial.

- 27 -

The trial justice sentenced defendant on February 13, 2023. He received two life sentences, to be served consecutively to each other; three concurrent six-year sentences, suspended with probation; one concurrent ten-year sentence, to be served; one concurrent ten-year sentence, suspended with probation; one concurrent five-year sentence, to be served; two consecutive ten-year sentences, suspended with probation; and a ten-year consecutive sentence as an habitual offender.

The defendant filed a notice of appeal on February 13, 2023.

## II

### Issues on Appeal

The issues raised before this Court by defendant are: (1) whether the trial justice erred in allowing Sgt. Primiano to offer a lay opinion to the effect that "the car in the surveillance video was consistent with an Audi, when the surveillance video was available for the jury to consider on its own;" (2) whether the trial justice erred in denying a hearing pursuant to *Franks v. Delaware*; (3) whether the trial justice erred in allowing Mr. Terrero to testify "about unrelated shootings;" and (4) whether the trial justice erred in admitting certain photographs of defendant. We shall address defendant's contentions *seriatim*.

## III

## Standards of Review

## A

## The Standard of Review as to the Evidentiary Issues

This Court has stated that "[w]hen reviewing the decision of a trial justice to admit certain evidence, * * * questions as to the admissibility *vel non* of evidence are confided to the sound discretion of the trial justice." *State v. Pitts*, 990 A.2d 185, 189 (R.I. 2010) (internal quotation marks and deletion omitted); *see also State v. Merida*, 960 A.2d 228, 234 (R.I. 2008). Accordingly, "[w]e will not overturn the ruling of a trial justice with respect to an evidentiary issue unless it constitutes an abuse of the justice's discretion and prejudices the complaining party." *Pitts*, 990 A.2d at 189 (internal quotation marks omitted). In conducting this review, we "allow wide latitude to determine both the relevance and the admissibility of evidence." *Id.* (internal quotation marks omitted); *see also State v. Dominick*, 968 A.2d 279, 282 (R.I. 2009). Additionally, "we are disinclined to perceive an abuse of discretion so long as the record contains some grounds for supporting the trial justice's decision." *Pitts*, 990 A.2d at 189-90 (internal quotation marks and deletion omitted).

**B**

**The Standard of Review as to the *Franks* Hearing Issue**

This Court has stated that it reviews "rulings denying *Franks* hearings with deference." *State v. Verrecchia*, 880 A.2d 89, 99 (R.I. 2005); *see also State v. DeMagistris*, 714 A.2d 567, 576 (R.I. 1998) ("[W]e review a lower court's determination that the defendant failed to satisfy the *Franks* standard with deference."). We have also stated that the "party seeking a *Franks* hearing bears the burden of proof." *Verrecchia*, 880 A.2d at 99.

**IV**

**Analysis**

**A**

**The Lay Opinion Testimony**

On appeal, defendant first contends that the trial justice erred in allowing Sgt. Primiano to offer testimony that the vehicle depicted in the surveillance video was consistent with an Audi. The defendant points to the fact that the video surveillance as well as photographs of the seized Audi had been reproduced and were available for the jury to review and that therefore the jury did not need Sgt. Primiano's "commentary." The defendant asserts that Sgt. Primiano was not in a better position than the jury to identify the car, because (1) he had not "manipulated the video to view, clarify, or enhance images," and (2) he did not have "specific familiarity with

Audis and he could not identify other black sedans." Additionally, defendant argues that the trial justice's reliance on the case of *State v. Doyle*, 235 A.3d 482 (R.I. 2020), was misplaced. It is defendant's position that admission of this evidence was prejudicial error and that there was a "reasonable possibility that the admission of this evidence contributed to the conviction."

For its part, the state argues that the trial justice "did not abuse her discretion in finding that Sgt. Primiano's hours-long examination of the frame-by-frame video footage might assist the jury in making its initial determination regarding whether the depicted vehicle was generally an Audi or not." Moreover, the state posits that "whether it was the Audi later seized in connection with this case and, furthermore, whether they believed [Mr.] Terrero and [Ms.] Pereira's testimony placing defendants in that Audi that night was entirely up the jurors."

Rule 701 of the Rhode Island Rules of Evidence provides:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

Rule 702 of the Rhode Island Rules of Evidence provides that, when testimony requires "scientific, technical, or other specialized knowledge," such testimony should be presented through a qualified expert.

This Court "has adopted a two-part test for the admission of lay opinion testimony: (1) the lay witness must have had an opportunity to view the person or event at issue; and (2) the lay witness must be able to give concrete details on which the opinion was founded." *State v. Ortiz*, 609 A.2d 921, 930 (R.I. 1992) (internal quotation marks omitted). This Court has further stated that "[a] lay witness may not invade the jury's fact-finding role by proffering an opinion, unless that opinion is based upon personal perception and helps the jury." *State v. Mann*, 889 A.2d 164, 168 (R.I. 2005); *see also State v. Bettencourt*, 723 A.2d 1101, 1111 (R.I. 1999) ("Opinion testimony may be rendered when the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time, and the facts upon which the witness is called to express an opinion are such that persons in general are capable of comprehending.") (internal quotation marks and brackets omitted).

It will be recalled that defendant takes particular exception to the trial justice's reliance on *State v. Doyle*, 235 A.3d 482 (R.I. 2020), which she viewed as constituting a situation comparable to the one presently before us. In *Doyle*, this Court ruled that a state police detective, who had an established background in accounting and experience as a fraud examiner, was properly permitted to provide lay opinion testimony regarding certain expenditures on an American Express card. *Doyle*, 235 A.3d at 498, 501. A summary of the detective's "findings as to which

expenses were personal and which were legitimate business expenses under various credit cards and other accounts was admitted into evidence." *Id.* at 499. On appeal, the defendant contended that the detective did not qualify as an expert and that, as a lay witness, her testimony was inadmissible. *Id.* In upholding the trial justice's decision to admit the testimony, this Court stated:

> "Certainly, Det. Elliott's rationale for concluding that certain credit card charges were personal and not Institute-related was informed by her qualifications and experience, including a bachelor's degree in accounting and years of experience as an accountant in Chicago. Undoubtedly, Det. Elliott's opinions were helpful to a clear understanding of her testimony and the determination of facts at issue. This witness was available and subject to cross-examination. The state was not required to introduce all of the voluminous evidence—upon which Det. Elliott relied—in order for the jury to reach the same conclusion." *Id.* at 500 (footnote omitted).

The defendant contends that in *Doyle* the jury did not have "all of the extensive information the state police detective reviewed and relied on to form her opinion." The defendant argues that, in the case at bar by contrast, the jury did have the information necessary to make a determination because "the state introduced the video surveillance and photographs of the seized Audi." Although defendant concedes that the jury did not have the specific video software that Sgt. Primiano had used to analyze the footage, he maintains that the jury "could slow it down and watch it at 30 frames per second and at different time intervals." We are unpersuaded by defendant's attempt to distinguish *Doyle*.

- 33 -

It is our view that, as was the case with the police detective in *Doyle*, Sgt. Primiano's lay opinion was based upon his perceptions. In *Doyle*, the Court emphasized that the detective, who had extensive experience in the field of accounting, carefully reviewed thousands of transactions and also contacted vendors to assist her in understanding the nature of the expenditures. *Doyle*, 235 A.3d at 498, 500. In a similar fashion, Sgt. Primiano, who has had experience and extensive training in seizing, documenting, and analyzing video evidence, reviewed the video footage by utilizing Video Focus Pro software. He then compared the images from the video surveillance to images which he had obtained from the Internet as well as from "images [he] had obtained of the vehicle which was seized during this investigation." Although Sgt. Primiano's lay opinion was not based upon first-hand observations, it was nonetheless rationally based on his own perceptions which resulted from his review of the video footage and other materials. In addition, we perceive no error in the trial justice's determination that Sgt. Primiano's examination and explanation thereof would assist the jury in determining whether or not the vehicle depicted in the footage was consistent with an Audi.

We are likewise unpersuaded by defendant's further attempt to distinguish this case from *Doyle* on the grounds that the jury in the instant case (unlike the situation in *Doyle*) actually had the video surveillance footage and photographs of the seized vehicle and therefore did not need Sgt. Primiano's opinion. We

- 34 -

underscore the fact that the record reveals that the jury did not have the ability, as Sgt. Primiano did, to review the footage using Video Focus Pro software. Additionally, the jury was without certain other information that Sgt. Primiano had utilized in his review. For example, they did not have the hundreds of frame-by-frame video images or downloaded images of Audi factory rims.

We further note that, unlike the situation in *Doyle*, where the detective gave an opinion regarding an issue of ultimate fact in the case (*viz.*, whether there were unauthorized transactions referenced on the defendant's credit card statement), Sgt. Primiano did not testify that the vehicle in the surveillance footage was the vehicle seized or that it was definitively an Audi. The trial justice expressly limited Sgt. Primiano's testimony, allowing him to offer "a lay opinion with respect to the dark-tinted sedan seen in the video surveillance as being consistent with an Audi." In addition, the trial justice emphasized that Sgt. Primiano would be subject to cross-examination.

Accordingly, we perceive no abuse of discretion in the trial justice's decision to allow Sgt. Primiano to offer lay opinion testimony.

## B

## Request for a *Franks* Hearing

The defendant's second contention on appeal is that the trial justice erred in denying a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). The

defendant specifically asserts that Det. Michael made two materially false statements in his affidavit in support of a warrant application for defendant's cell phone information. He claims that the information Det. Otrando relayed to Det. Michael (*viz.*, that the vehicle depicted in the surveillance footage was a "Black Audi with heavy tint around all the windows" and that the vehicle later seized during the narcotics investigation that led to Mr. Terrero's arrest "was observed to be the same vehicle as seen in the video footage related to the homicide") was false because it is defendant's claim that the video footage was too unclear to determine the make and model of the black-tinted vehicle. The defendant asserts that the "government is accountable for statements, which include omissions, made not only by the affiant, but those conveyed to the affiant by other government employees." The defendant further contends that these allegedly false statements were necessary to finding probable cause.

It is true that a defendant is "entitled to a hearing to challenge the veracity of factual statements contained in an affidavit when [the defendant] make[s] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *State v. Hudgen*, 272 A.3d 1069, 1084 (R.I. 2022) (internal quotation marks and brackets omitted); *see also Franks*, 438 U.S. at 155-56. Such a defendant is

required to make an offer of proof that "point[s] out specifically the portion of the warrant affidavit that is claimed to be false * * *." *Franks*, 438 U.S. at 171; *see also Verrecchia*, 880 A.2d at 99 (noting that the "party seeking a *Franks* hearing bears the burden of proof"). Furthermore, the alleged false aspects of the warrant application must be "traceable to the affiant's intent to deceive the magistrate issuing the warrant or * * * the affiant [must have] proceeded with reckless disregard for the veracity of the statements included in his or her affidavit." *DeMagistris*, 714 A.2d at 575. Finally, the Court in *Franks* stated that "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171-72.

It is our opinion that the trial justice did not abuse her discretion in denying defendant's motion for a *Franks* hearing. The trial justice acknowledged that the statements in the warrant—namely, that the vehicle in the footage was an Audi and that it was the same vehicle as the one that was later recovered as a result of a narcotics investigation—could be characterized as overstatements. However, she also pointed out that the statements were not necessarily baseless—as it had always been Det. Otrando's position that the vehicle in the footage was an Audi. *See Verrecchia*, 880 A.2d at 99 (observing that there is a presumption of validity with respect to an affidavit supporting a search warrant). Importantly, the trial justice

- 37 -

also found that, while there may have been some degree of overstatement on Det. Otrando's part, there was nothing that would indicate that Det. Michael "acted with some intent to deceive or with reckless disregard of the veracity of those statements." Moreover, the overly broad use of terms does not necessarily constitute a material falsehood or indicate an intent to deceive.

Even assuming *arguendo* that the allegations concerning mischaracterizations in the affidavit are true, there nevertheless remained more than sufficient evidence to support a finding of probable cause. As the trial justice noted, "the involvement of the black Audi" stems "directly from the so-called cooperating witness, * * * [Ms.] Pereira." Having carefully reviewed the record, it is our opinion that the trial justice's decision as to the existence of probable cause is supported by the record.

Consequently, we conclude that defendant was not entitled to a *Franks* hearing and that the trial justice did not abuse her discretion in denying such a hearing.

## C

### Evidence Admitted Pursuant to Rule 404(b)

The defendant next contends that the trial justice erred in allowing Mr. Terrero to testify about what defendant characterizes as "unrelated" shootings. He points to testimonial evidence provided by Mr. Terrero that was admitted concerning: (1) two shootings involving defendant; (2) two shootings directed at defendant and others;

and (3) the murder of Mr. Terrero's friend, Mr. Contreras. It is defendant's argument that this evidence violated Rule 404(b) by virtue of it being propensity evidence. He additionally asserts that this evidence was prejudicial because it "announced to the jury that [defendant] participated in shootings and lived a violent lifestyle." The defendant argues that the state relied on "improper evidence to convict" him because: (1) there was no connection between defendant and the decedent; (2) there was no showing of a motive for defendant to be involved in the June 26, 2018 events at 100 Lowell Avenue; (3) the video surveillance footage of "the crime scene was vague at best;" and (4) there was no direct evidence that placed defendant at the crime scene.

The defendant also argues that the trial justice failed to conduct the necessary Rule 403 analysis before admitting the Rule 404(b) evidence. He adds that, had the trial justice conducted a Rule 403 analysis, "the negligible probative value and enormous prejudice would have been clear, warranting exclusion of this evidence." Additionally, defendant asserts that the instructions given by the trial justice relative to that evidence could not cure the overly prejudicial nature of the evidence.

In ascertaining whether the trial justice properly admitted evidence pursuant to Rule 404(b), this Court has emphasized that

> "[b]y way of exception to the general prohibition against admitting evidence of prior bad acts, Rule 404(b) permits the admission of evidence of other crimes, wrongs, or acts when such evidence is offered to prove motive,

- 39 -

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable." *State v. Jimenez*, 882 A.2d 549, 553 (R.I. 2005) (internal quotation marks omitted).

We have further stated, however, that "[e]ven when admissible, * * * this type of evidence should be sparingly used by the prosecution and only when reasonably necessary." *Id.* (internal quotation marks omitted).

The evidentiary rule seeks to exclude evidence of prior bad acts, crimes, and wrongs because "admitting this kind of evidence presents the risk that jurors might convict a defendant for a crime other than the one being charged." *State v. Reis*, 815 A.2d 57, 61-62 (R.I. 2003). For that reason, we have cautioned that, in order to protect against the possibility that a jury might convict a defendant for a crime with which he or she was not charged, "the trial justice must carefully weigh the probative value of the evidence against the danger of unfair prejudice * * *." *Id.* at 62 (quoting *State v. Pratt*, 641 A.2d 732, 742 (R.I. 1994)). And "[i]f the trial justice determines that the probative value does outweigh the prejudicial effect, he [or she] should offer a specific instruction to the jury as to the limited purpose for which the evidence is being introduced." *Id.* (internal quotation marks and brackets omitted).

It is our opinion that the trial justice in this case did not abuse her discretion in admitting, pursuant to Rule 404(b), the evidence concerning the prior shootings. The record reveals that the trial justice appreciated the background information

provided by this evidence and its resulting probative value. For example, in the interim between the shootings about which Mr. Terrero testified, Mr. Contreras, a friend of both Mr. Terrero and defendant, was murdered. There was evidence elicited by the state from Mr. Terrero to the effect that codefendants and Mr. Terrero discussed Mr. Contreras's death and that the "tone of those conversations" was "tense." Mr. Terrero indicated that gang members were desirous of revenge. Such revenge included retaliation which would involve taking "rides" and looking for rival gang members. What we have just described is relevant in providing context to defendant's request for Mr. Terrero to "take a ride" shortly before Mr. Page's murder. It also provides some context as to defendant's text messages to Mr. Terrero, which were sent shortly after Mr. Page's murder, wherein he warned Mr. Terrero of the potential danger involving opposing gangs. *See generally United States v. Abel*, 469 U.S. 45, 49 (1984) (unanimously holding that there are occasions when membership in a gang constitutes admissible evidence).

The defendant asserts that the evidence of the prior shootings has no evidentiary relevance as to the motive or intent to shoot those persons present at 100 Lowell Avenue on June 26, 2018 and that those persons had no connection to the codefendants. The state counters by contending that Mr. Terrero's "testimony and the previous shootings demonstrated that no specific connection was required to motivate these gang shootings." We agree.

- 41 -

As we turn our attention to the Rule 404(b) issues in this case, it is important to bear in mind that there is a disturbing level of violence in our world, which is very often the fruit of ready access to firearms and often the result of internecine and extremely violent interactions between members of rival gangs. In the instant case, the 864 crossover gang activity involved indiscriminate violent conduct: drive-by shootings, persons being shot at, and often lawless access to firearms. We are unpersuaded by defendant's attempt to suggest that the evidence concerning the other shootings was too distant in time in relation to the murder of Mr. Page. The pattern of retaliatory drive-by shootings was a sad reality right up to the time of Mr. Page's murder. While we are "quite aware of (and respectful of) the prohibition against using evidence of prior wrongs to show the defendant's propensity to commit the crime with which he is currently charged," admitting evidence of a pattern of retaliatory shootings is consistent with the established "principle that evidence of other conduct, even of a criminal nature, may be received if it is interwoven with the current charge in a way that tends to establish guilty knowledge, intent, motive, design, plan, scheme, system, or the like." *State v. John*, 881 A.2d 920, 926 (R.I. 2005) (internal quotation marks and brackets omitted); *see State v. Colon*, 198 A.3d 1249, 1254 (R.I. 2019) ("This Court has permitted the introduction of other crimes evidence when crimes are interwoven or in instances when introduction is necessary for a trier of fact to hear a complete and coherent story so as to make an accurate

determination of guilt or innocence.") (internal quotation marks and deletion omitted); *State v. Pona*, 948 A.2d 941, 950 (R.I. 2008).

Among other contentions, defendant takes issue with the trial justice having cited "access to firearms" as a reason to admit the evidence pursuant to Rule 404(b). The defendant concedes that he had access to firearms; however, he asserts that there was other evidence, unrelated to other prior shootings, that established this fact.

In *State v. Rios*, 996 A.2d 635 (R.I. 2010), this Court dealt with a somewhat similar Rule 404(b) issue in that the state had sought to admit testimony that the defendant frequently carried a firearm. *Rios*, 996 A.2d at 637, 639. In addressing the issue, we noted that "the state did not seek to admit any firearms allegedly belonging to defendant; rather, it sought to elicit testimony indicating that defendant had access to a handgun." *Id.* at 640. Importantly, we further stated that "[e]vidence that defendant frequently carried a handgun, if true, was relevant to demonstrate that he had access to a weapon and had the opportunity to murder [the decedent]." *Id.*

In the case at bar, we perceive no abuse of discretion on the part of the trial justice in allowing the admission of testimony about the shootings as tending to be probative of the fact that defendant had access to firearms. In accord with our holding in *Rios*, Mr. Terrero's testimony indicated that defendant generally had access to firearms rather than suggesting that a particular firearm belonged to defendant. Although defendant argues that other, less prejudicial, evidence had been

- 43 -

admitted which supported the concept that defendant had access to firearms, it is our view that it was not an abuse of discretion to admit the evidence of prior shootings involving members of the crossover 864 gang. Due to the fact that the timing of retaliatory actions and the specific sequence of events are such crucial aspects in understanding gang-related violence, the evidence clearly could be a basis for the jurors to conclude that defendant had routine access to firearms in the months leading up to the June 26, 2018 shooting.

Although the trial justice did not provide an explicit Rule 403 analysis on the record when ruling on the Rule 404(b) issue, we do not consider the absence of such an explicit analysis to constitute reversible error in the circumstances of this case. We are satisfied that the trial justice did in actuality, if not in so many words, engage in such an analysis at the time of her ruling with respect to the Rule 404(b) evidence. It is apparent from the trial justice's exclusion of evidence of another gang member's arrest for possession of a firearm, which the state sought to utilize to demonstrate the access to "community guns," that the trial justice was mindful of the risk of the overly prejudicial nature of some evidence being introduced pursuant to Rule 404(b). In excluding the introduction of the just-mentioned evidence, the trial justice stated that that particular piece of evidence was "more guilt by association than true 404(b) evidence * * *."

Furthermore, the trial justice's discussion at the hearing on the motion for a new trial additionally confirms the notion that a Rule 403 analysis was *sub silentio* an integral part of her rulings relative to the Rule 404(b) evidence. It is noteworthy that, in addressing defendant's contention that evidence had been improperly admitted pursuant to Rule 404(b), the trial justice explicitly stated at that hearing that, even if the "evidence clears the 404(b) hurdle, it may still be excluded if it does not survive scrutiny under 403 * * *." Significantly, the trial justice also reiterated her earlier observation that certain additional evidence had been excluded because she had found "such evidence to be unduly prejudicial and [had] excluded such evidence under a Rule 403 analysis."

In *State v. Cavanaugh*, 158 A.3d 268 (R.I. 2017), we were faced with a similar situation in which the trial justice failed to engage in an explicit Rule 403 analysis. *Cavanaugh*, 158 A.3d at 281. Although we indicated that the trial justice should have undertaken a Rule 403 analysis, we proceeded to hold that that "error [was] harmless because the evidence was correctly admitted, and its probative value outweighed any potential prejudice." *Id.* The same rationale applies to the instant case. Accordingly, even assuming *arguendo* that the trial justice's implicit Rule 403 analysis was insufficient, we conclude that it would be harmless error due to the fact that the evidence was properly admitted in that its probative value outweighed the risk of unfair prejudice.

Finally, we are likewise satisfied that the several cautionary instructions given by the trial justice sufficiently abated any risk of unfair prejudice. The trial justice provided a practically identical cautionary instruction after the introduction of virtually every piece of evidence admitted pursuant to Rule 404(b). In addition, her final jury instructions included the following admonition:

> "Now, you have heard evidence in this trial that on other occasions these Defendants allegedly were involved in other misconduct. Bear in mind that neither Defendant has been charged with any offense arising out of that misconduct. That evidence was admitted for a limited purpose. It cannot be considered as proof of bad character on their part or proof that they acted in conformity with the uncharged alleged acts when you consider the charges in this case. However, if you do wish to do so, you may consider evidence of uncharged alleged acts for the limited purpose of proving the Defendant's intent, knowledge, motive, plan, or their participation in a felonious scheme such as a conspiracy and not for any other purpose."

The instructions were numerous and comprehensive. *See Cavanaugh*, 158 A.3d at 282 ("We are satisfied that this cautionary instruction served to eliminate any unfair prejudice that defendant may have faced from this testimony."). We also note that, at no point during the introduction of the Rule 404(b) evidence or when the trial justice delivered her final instructions did defendant object to the cautionary instructions concerning the evidence. *See id.* at 281; *see also State v. Cook*, 45 A.3d 1272, 1280 (R.I. 2012); *Rios*, 996 A.2d at 640.

For these reasons, we perceive no abuse of discretion on the part of the trial justice in admitting the evidence that was admitted pursuant to Rule 404(b).

## D

## Admission of Photographic Evidence

As defendant's final argument, he contends that the trial justice erred in admitting photographs of defendant holding firearms as well as employing gestures that could be understood as relating to gang involvement. As previously noted, the photographic evidence consisted of: (1) two photographs from 2017 which depicted Mr. Terrero and defendant making certain hand gestures, with defendant holding a firearm in both photographs; (2) a third photograph from early 2018 which showed Mr. Terrero and defendant again making hand gestures; and (3) a fourth photograph from the Spring of 2018 showing one of defendant's tattoos which displayed a Spartan helmet containing the numbers "864."

Citing Rule 401 of the Rules of Evidence, defendant contends that the photographs have no relevance to the murder of Mr. Page. The defendant specifically points out that the "two photographs where [defendant] is holding a gun were taken over a year before the murder." Moreover, it is defendant's contention that there is no connection between the murder weapon and the firearms depicted in the photographs. Similarly, defendant argues that there is no connection between "the location of any of these photographs and the planning of [Mr.] Page's murder."

Lasty, defendant posits that there was no evidence that connected the murder to gang involvement or membership. The state for its part emphasizes that the photographs were probative of the relationship between Mr. Terrero and defendant, which the state describes as being "a big part of the case."

The defendant further argues that, even if this evidence did have limited probative value, it should have been excluded pursuant to Rule 403. The defendant offers several reasons in support of his contention that the photographic evidence should have been excluded. He first asserts that the photographs of defendant holding a firearm "sent a message to the jury that he was a bad person and predisposed to commit crimes of violence." He also submits that some of the hand gestures in the photographs could have been interpreted as gang signs. Finally, he argues that the tattoo shown in one of the photographs could have led to a negative inference that defendant was affiliated with a gang. Additionally, defendant contends that the photographs were cumulative, confused the issues, and misled the jury.

Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See State v. Thomas*, 936 A.2d 1278, 1282 (R.I. 2007) (stating "that evidence which is not relevant is not admissible") (brackets and internal quotation marks omitted).

However, we have further made clear that "it should be remembered that this Court has interpreted Rule 403 * * * as providing that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *Pitts*, 990 A.2d at 190 (internal quotation marks and brackets omitted); *see State v. Silvia*, 898 A.2d 707, 717 (R.I. 2006).

We are satisfied that, pursuant to Rule 401, the photographs at issue in this case were relevant as tending to corroborate Mr. Terrero's testimony regarding his relationship with defendant, thereby providing meaningful support for the state's theory of the case. Additionally, as the trial justice indicated, the photographs showing defendant holding a firearm would constitute further evidence of his "access to firearms." Although defendant maintains that that there is no direct link between the firearms in the photographs and the murder weapon, the photographic evidence nonetheless demonstrated, as the trial justice noted, defendant's "access to handguns, having familiarity with handguns." *See State v. Rivera*, 640 A.2d 524, 526 (R.I. 1994) ("A photograph is relevant if it has a tendency to prove or disprove some material fact in issue.") (internal quotation marks omitted). As to the issue of the photographs not having been taken in close proximity to the time of the crime, the trial justice stated that, "notwithstanding the approximately year plus difference in time between that photograph and the murder on June 26th, 2018, it does demonstrate the close relationship between Mr. Terrero and [defendant]."

Accordingly, our examination of the record does not convince us that the trial justice abused her discretion in permitting the admission of the photographs.

With respect to the defendant's Rule 403 argument concerning the photographs, we agree with the trial justice that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. As was the trial justice's reasoning, the evidence of the photographs could demonstrate the close relationship between Mr. Terrero and the defendant, and the contents of those photographs is not so prejudicial as to warrant exclusion under Rule 403. We are unable to conclude that the possible prejudice from the admission of these photographs outweighs the probative value of the evidence—particularly in light of the fact that the trial justice gave the jury a limiting instruction with respect to gang or group affiliation. Accordingly, it is our view that the trial justice did not abuse her discretion in admitting the photographs.

## V

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal..



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Chandanoeuth Hay. |
| **Case Number** | No. 2023-235-C.A. (P1/19-6260AG) |
| **Date Opinion Filed** | May 29, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General<br>For Defendant:<br><br>Camille A. McKenna<br>Rhode Island Public Defender |